IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW MEXICO

CRUZ ALICIA FLORES, on behalf
of GILBERT A. FLORES, deceased.

        Plaintiff,

vs.                            No.  02cv1450 DJS

JO ANNE B. BARNHART,
COMMISSIONER OF SOCIAL SECURITY,

        Defendant.

## MEMORANDUM OPINION

This matter is before the Court on Plaintiff's (Flores') Motion to Reverse or in the

Alternative, to Remand for a Rehearing **[Doc. No. 17]**, filed July 3, 2003, and fully briefed on

September 10, 2003.[1]   On July 27, 2000, the Commissioner of Social Security issued a final

decision denying Flores' application for supplemental security income benefits.   Having

considered the arguments, pleadings, administrative record, relevant law, and being otherwise

fully informed, the Court finds the motion to reverse is well taken and will be GRANTED.

## I.  Factual and Procedural Background

Flores, now deceased, filed his application for supplemental security income benefits on

December 5, 1995, with a protective filing date of February 14, 1994.  Tr. 110.  That application

was granted on August 21, 1995, for a period of three years because it was based upon the effects

of alcoholism.   Tr. 69-72.  Flores had a ninth grade education and past relevant work as a cotton

---

[1] On April 1, 2003, Flores' counsel submitted a Noticed of Death of Plaintiff.  The notice
indicated Flores had died on January 17, 2003.  Pursuant to 20 C.F.R. § 416.542, Mrs. Flores is
proceeding with Flores' claim.

gin worker and janitor.  Tr. 70.  In 1997, Flores' benefits were terminated.  Tr. 90.  On April 15,

1997, Flores filed an untimely request for review of this decision.  On August 14, 1997, the

agency denied review.  Therefore, on October 16, 1997, Flores filed a second application for

supplemental security income benefits, with a protective date of September 9, 1997.  Tr. 133-136.

In the second application, Flores alleged he was disabled due to panic attacks, anxiety attacks,

nervousness, and depression  On July 27, 2000, the Commissioner's Administrative Law Judge

(ALJ) denied benefits.  The ALJ further found Flores retained the residual functional capacity

(RFC) to perform a range of sedentary work.  Tr. 18.  The ALJ also found Flores not credible.

*Id.*  Flores filed a Request for Review of the decision by the Appeals Council.  On October 8,

2002, the Appeals Council denied Flores' request for review of the ALJ's decision.  Tr. 6.  Hence,

the decision of the ALJ became the final decision of the Commissioner for judicial review

purposes.  Flores seeks judicial review of the Commissioner's final decision pursuant to 42 U.S.C.

§ 405(g).

## II.  Standard of Review

The standard of review in this Social Security appeal is whether the Commissioner's final

decision is supported by substantial evidence and whether he applied correct legal standards.

*Hamilton v. Secretary of Health and Human Services,* 961 F.2d 1495, 1497-98 (10th Cir. 1992).

Substantial evidence is more than a mere scintilla and is such relevant evidence as a reasonable

mind might accept as adequate to support a conclusion. *Glass v. Shalala*, 43 F.3d 1392, 1395

(10th Cir. 1994).  "Evidence is not substantial if it is overwhelmed by other evidence in the record

or constitutes mere conclusion."  *Musgrave v. Sullivan*, 966 F.2d 1371, 1374 (10th Cir. 1992).

Moreover, "all of the ALJ's required findings must be supported by substantial evidence,"

2

*Haddock v. Apfel,* 196 F.3d 1084, 1088 (10th Cir. 1999), and all of the relevant medical evidence

of record must be considered in making those findings, *see Barker v. Bowen*, 886 F.2d 289, 291

(10th Cir. 1989).  "[I]n addition to discussing the evidence supporting his decision, the ALJ must

discuss the uncontroverted evidence he chooses not to rely upon, as well as significantly probative

evidence he rejects."  *Clifton v. Chater*, 79 F.3d 1007, 1010 (10th Cir. 1996).  Therefore, while

the Court does not reweigh the evidence or try the issues de novo, *see Sisco v. United States*

*Dep't of Health & Human Servs.*, 10 F.3d 739, 741 (10th Cir. 1993), the Court must

meticulously examine the record as a whole, including anything that may undercut or detract from

the ALJ's findings, in order to determine if the substantiality test has been met.  *See Washington*

*v. Shalala*, 37 F.3d 1437, 1439 (10th Cir. 1994).

### III.  Discussion

In order to qualify for disability insurance benefits or supplemental security income, a

claimant must establish a severe physical or mental impairment expected to result in death or last

for a continuous period of twelve months which prevents the claimant from engaging in

substantial gainful activity.  *Thompson v. Sullivan*, 987 F.2d 1482, 1486 (10th Cir. 1993)(citing

42 U.S.C. §423(d)(1)(A)).  The regulations of the Social Security Administration require the

Commissioner to evaluate five factors in a specific sequence in analyzing disability applications.

20 C.F.R. § 404.1520 (a-f).  The sequential evaluation process ends if, at any step, the

Commissioner finds the claimant is not disabled.  *Thompson v. Sullivan*,  987 F.2d at 1487.

At the first four levels of the sequential evaluation process, the claimant must show he is

not engaged in substantial gainful employment, he has an impairment or combination of

impairments severe enough to limit his ability to do basic work activities, and his impairment

meets or equals one of the presumptively disabling impairments listed in the regulations under 20 C.F.R. Part 404, Subpt. P, App. 1, or he is unable to perform work he had done in the past. 20 C.F.R. §§ 404.1520 and 416.920.  At the fifth step of the evaluation, the burden of proof shifts to the Commissioner to show the claimant is able to perform other substantial gainful activity considering his residual functional capacity, age, education, and prior work experience. *Id.*

In support of his motion to reverse, Flores makes the following arguments: (1)  the ALJ's finding that his mental impairment was not severe is not supported by substantial evidence; (2) the ALJ erred in rejecting the opinion of his treating physician; and (3) the ALJ erred in relying on the grids to find plaintiff not disabled.

## A.  Mental Impairment

Flores contends the ALJ's finding that his mental impairment is not severe is not supported by substantial evidence and is contrary to law.  Flores contends his treating therapist opined he was unable to work due to panic and anxiety attacks.  Flores also claims Dr. Jorge Vargas, a psychiatrist and agency consultant, found he had rapid speech, anxiety and rated him from fair to poor in the areas of concentration, persistence and pace and poor in the area of ability to interact with the public.

While Flores bears the burden of proving his disability, at step two his burden is "de minimis."  At step two, a claimant is required only to make a "de minimis showing" that his medically determinable impairments, in combination, are severe enough to significantly limit his ability to perform work-related activity.  *Williams v. Bowen*, 844 F.2d 748, 750-51 (10th Cir. 1988).  Although an impairment is not severe if it has no more than a minimal effect on an individual's physical or mental abilities to do basic work activities**,** the possibility of several such

impairments combining to produce a severe impairment must be considered.  *See* SSR 85-28, 1985 WL 56856, at *3, *4 (1985).

Under 20 C.F.R. §§ 406.923, when assessing the severity of whatever impairments an individual may have, the adjudicator must assess the impact of the combination of those impairments on the person's ability to function, rather than assess separately the contribution of each impairment to the restriction of his or her activity as if each impairment existed alone.  A claim may be denied at step two only if the evidence shows that the individual's impairments, when considered in combination, are not medically severe, i.e., do not have more than a minimal effect on the person's physical or mental abilities to perform basic work activities.   20 C.F.R. § 416.921.  If such a finding is not clearly established by medical evidence, however, adjudication must continue through the sequential evaluation process.  20 C.F.R. §§ 416.923.

In this case, the ALJ found:

I further find that the claimant does not have a severe mental impairment consistent with the opinion of the Consultant's.  Exhibit B1F documents that on October 3, 1997, a treatment plan was formulated by Border Area Mental Health Services, (Border) in order to address the claimant's anxiety and alcohol abuse (Exhibit 2F dated May 2, 1997, notes that the claimant was medically advised to stop drinking on that date).  The plan was to extend until March 8, 1998, but the last report from Border is dated December 2, 1997.  A report dated November 17, 1997 (Exhibit B1F), by a social worker, co-signed by Dr. Georgina Herrera, indicates that the claimant was then ". . . unable to work at the present time . . . ."  The consultants who initially reviewed this treatment pattern concluded that the claimant's impairment was not severe in nature due to a lack of psychotic ideation or cognitive deficits (Exhibits B3F and B4F).  When the claimant requested reconsideration, he was sent to a consultative psychiatric examination in order to assess his mental status (Exhibit B7F).

The claimant stated that the had been experiencing anxiety attacks for about five years that had required different medications.  He stated that he was still seeing Dr. Herrera, but that he had never required hospitalization.  The examiner reported sings of major depression, a pain disorder and alcohol dependence in partial remission.  He reported that the claimant was ". . . somewhat impaired . . . " in concentration, persistence, interaction with others, and in the ability to adapt to changes in a work environment.  However, the Consultants who reviewed this report (Exhibit B10F and B11F) once again determined non-severity

based upon the fact that the claimant's symptoms appeared to be a function of his continued alcohol abuse.  Exhibit B7F is the last report directly addressing the claimant's mental state from any source.  Exhibit B16F, dated March 29, 1999, reflects that the claimant was still consuming alcohol on that date.  However, a report dated May 16, 2000 (Exhibit 17F), indicates that the claimant had not consumed alcohol for 18 months, indicating a remission since about March 1999.  At the hearing, the claimant testified that he had not been seen at Border for a two to three year period.  He asserted that he believed that he was disabled due to physical reasons, and not mental.  He also described a wide variety of activities of daily living and social interaction with family members.

From the preceding, I do not see facts sufficient to conclude that the opinion of the Consultants on the issue of mental severity is unreasonably inconsistent with the evidence as a whole.  The evidence in file related to mental work limitations is associated with a period when the claimant was consuming alcohol.  The claimant did seek treatment from Border, but he terminated this interaction as well under a year's time.  Finally, the claimant admits that he does not believe that he is disabled due to mental causes.

Tr. 17.  The ALJ's finding that Flores' mental impairment was nonsevere because the "evidence in file related to mental work limitations is associated with a period when [Flores'] was consuming alcohol" is not supported by substantial evidence.

On November 4, 1999, Dr. Lundy, Flores' treating physician, noted Flores "had not had any alcohol since **March of 1999,**" however, he was still experiencing anxiety.  Tr. 292 (emphasis added).  Dr. Lundy noted Flores was to take "Librium 25 mg two times a day for his anxiety associated with alcoholism."  *Id.*  On August 17, 1999, Dr. Lundy noted Flores was "feeling extremely nervous."  Tr. 295.  On September 8, 1999, Dr. Lundy noted, " [Flores] has not had a drink for several months."  Tr. 296.  On August 24, 1999, Dr. Lundy noted, "Flores says his nerves are shot.  This patient has cirrhosis of the liver and I am treating him as an outpatient, giving him Librium 25 mg twice a day.  I told him to increase it up to one tablet three times a day for anxiety.  I don't want him getting back on any alcohol."  Tr. 298.  On April 14, 1999, Dr. Lundy noted Flores was no longer drinking but he was to continue taking Librium 25 mg three times a day for his panic attacks.  Tr. 304.  Contrary to the ALJ's finding, Flores met his burden

of establishing that his mental impairments of anxiety and panic attacks had more than a minimal

effect on his mental ability to do basic work activities.  The ALJ erred in not considering Flores'

mental impairments along with his other impairments when determining Flores' RFC.

The ALJ also noted, "Finally, the claimant admits that he does not believe that he is

disabled due to mental causes."  Tr. 17.  The ALJ relied on this "admission" to adopt the

consultants' opinions on the issue of mental severity.  The record does not support this statement.

At the administrative hearing, the ALJ questioned Flores regarding his ability to work.  In

response to the ALJ's questioning, Flores testified as follows:

Q:      What's wrong with you that keeps you from working?  What problems are you having?

A:      Due to my anxiety attacks and my panic attacks and mood swings, and stuff like that, you know, and I just can't, can't be at one place along (sic) time, you know, I've just got to be moving, or something.  And [inaudible] and my legs swell up when I stand up too long.  And I got pneumonia.

Q:      Okay, so you've got liver problems, what's wrong with your liver?

A:      Sclerosis.

Q:      Any other problems?

* * * * * * * *

Q:      Do you have friends of the family there in Deming that you see, and visit people, see– have friends, things like that?

A:      I really don't like to be around a lot of people, because I get real nervous.

Q:      Do you have some friends and family there?

A:      Yes sir.

Q:      Do you attend any kind of meetings, church, or anything like that?

A:      No.

Q:      Do you do anything socially?  Do you go out to eat?

A:      We will go for a walk in the afternoon, [inaudible] the kids–

Q:      Do you go out to eat?

A:     I don't like to be around other people, I just like to, you know, be by myself almost all the time. But my wife does, she brings some back to me.

Q:     Well what do you do?  Do you ever go to a movie, or–

A:     Oh, I go to the park.

Q:     Do you ever go to a movie?

A:     No, I'm not into that.

Q:     Do you ever go to a dance?

A:     Once in a great while, like I said, I'm not around, I'm not used to being around a lot of people or anything.

Q:     Do you go to a ball game rodeo, or car racing?

A:     No.

Q:     Anything like that?

A:     Fishing sometimes.

                         * * * * * * * * *

Q:     Do you ever go to any of the local games?

A:     Yes, to the high school games.

Q:     Do you attend those?  Go to those?


A:     I park at the outside, yeah, but I don't go inside.

                         * * * * * * * * *

ALJ:   One of the problems that I have is, I don't have much in the way of the treatment records on the mental disorders.  I've got some stuff, of course, but not a whole lot.  Is there anything recent?

Rep:   No, there isn't.  Would you allow us [inaudible]

ALJ:   Well, I don't know, we may have to.  But has he been going, receiving any treatment from Border Mental Health or anybody?

Clmt:  I went for mental.

ALJ:   How long's it been?

Clmt:  Two years.

ALJ:   Two or 3 years?  You haven't received any treatment for 2 or 3 years?

Clmt:  For [inaudible].

ALJ:   No for mental health treatment, psychiatrist, psychologist.

Clmt:  <u>Your honor, I don't think there is a mentally ill, physically.</u>

ALJ:  Well, that's what we're talking about is mental illness.  Have you received any treatment for the last 2 or 3 years?

Clmt:  No.

ALJ:  Okay.

Rep:  Okay.

ALJ:  What else?

Rep:  That's it, your honor, we just said that he would meet or equal the listing of impairment.

ALJ:  Which one?

Rep:  12.04 and 12.07.  [Inaudible] related disorders.  The 704.

Tr.  43, 46-47, 57-59 (emphasis added).  It is apparent from Flores' testimony that he felt his anxiety and panic attacks precluded him from working.  However, he did not feel he was mentally ill.  Significantly, Flores' non-attorney representative argued he met Listings 12.04 (Affective Disorders) and 12.07 (Somatform Disorders).  Therefore, Flores' testimony does not support the ALJ's finding that Flores admitted "he [did] not believe that he is disabled due to mental causes."  Tr. 17.

## B.  Treating Physician Opinion

A treating physician may offer an opinion which reflects a judgment about the nature and severity of the claimant's impairments including the claimant's symptoms, diagnosis and prognosis, and any physical or mental restrictions.   20 C.F.R. §§ 416.927(a)(2).  The Secretary will give controlling weight to that type of opinion if it is well supported by clinical and laboratory diagnostic techniques and if it is not inconsistent with other substantial evidence in the record.   20 C.F.R. § 416.927(d)(2).  A treating physician may also proffer an opinion that a claimant is totally disabled.   That opinion is not dispositive because final responsibility for determining the ultimate issue of disability is reserved to the Secretary.  20 C.F.R. § 416.927(e)(2).

Unless good cause is shown to the contrary, the Commissioner must give substantial

weight to the testimony of the claimant's treating physician.  If the opinion of the claimant's

physician is to be disregarded, specific legitimate reasons for this action must be set forth.  *Byron*

*v. Heckler*, 742 F.2d 1232 (10th Cir. 1984).  "'In choosing to reject the treating physician's

assessment, an ALJ may not make speculative inferences from medical reports and may reject a

treating physician's opinion outright only on the basis of contradictory medical evidence and not

due to his or her own credibility judgments, speculation or lay opinion.'"  *McGoffin v. Barnhart*,

288 F.3d 1248, 1252 (10th Cir. 2002)(quoting *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir.

2000)).  Moreover, an ALJ may not substitute his own opinion for medical opinion.  *See Sisco* , at

744.

In his decision, the ALJ noted:

> There is a difference of medical opinion as to the claimant's capacity to work.  On one
> hand, the Consultants determined a capacity for work activities limited only by postural
> and environmental factors as related in my 2nd finding.  On the other, Dr. John E. Lundy
> has stated (Exhibit B16F) that the claimant can only work for a 1 and ½ to a two hour
> period before fatigue sets in (although Dr. Lundy has also advised the claimant to work
> during periods in issue).  These perspectives are obviously at polar opposites.  Still, I have
> resolved this issued based upon the claimant's admissions at the hearing indicating an
> ability for sedentary work.
>
> The claimant testified that he performs yard work; he is able to drive with no restrictions
> on his license; he visits friends and relatives; he reads; watches TV; hunts and fishes; he
> does housework; and, he is able to shop.  He is able to see to his grooming needs; he helps
> his children get ready for school; he plays basketball; and, testifies that he can sit for ½
> hour, stand for up to 1 hour, walk a quarter of a mile, and lift up to 35 to 40 pounds.  If
> find these admissions consistent with an ability for sedentary work.  It is true that the
> claimant also testified to an inability to work, but this assertion is not reasonable given his
> admissions.  Accordingly, I do not find a reasonable basis to conclude that the claimant's
> assertions with respect to the degree, intensity, persistence, and severity of his limitations
> precluding all work activity are credible.

Tr. 18-19.  On September 13, 1999, Dr. Lundy submitted a letter of disability on behalf of Flores.

Tr. 265.  Dr. Lundy opined:

10

Mr. Flores has cirrhosis of the liver and as a result of this condition, he is susceptible to gastrointestinal bleeding.  On two occasions he has been hospitalized for a blood transfusion in order to correct an anemia associated with the gastrointestinal bleeding.  His condition is incurable, however, with proper diet and medication, we can certainly slow down the progression of this disease.

Mr. Flores is on medication that he needs to take on a daily basis.  At times it presents a financial hardship for him to pay for this medication.  He has tried to do odd jobs such as yard work, however, he becomes fatigued very easily.  So, he can only work for about an hour and a half to two hours before he becomes fatigued and cannot continue with his work.  Therefore, it is my opinion, that this patient will not be able to hold a full time job.  I am asking that you seriously consider Mr. Flores for Medicaid, if at all possible, so at least he can obtain his medications that will help prevent the progression of his disease.

Tr. 265.  Dr. Lundy's opinion that Flores was not able to hold a full time job is well supported by his medical records and is not inconsistent with other substantial evidence in the record.   Flores' medical records indicate as follows:

On March 19, 1999, Dr. Lundy admitted Flores to the Mimbres Memorial Hospital for rectal bleeding.  Tr. 323-324.  The physical examination indicated Flores had cirrhosis of the liver.  Dr. Lundy based his diagnosis on a distended abdomen which suggested ascites,[2]  hepatomegaly (enlarged liver), testicular atrophy, proctitis,[3] a positive guaiac[4] stool, abnormal partial thrombin time and prothrombin time[5], platelets were 80,000 (low) and a bilirubin of 21.7 (high) and calcium

---

[2] Ascites is the accumulation of serous fluid in the peritoneal cavity.  *Stedman's Medical Dictionary* 154 (26th ed. 1995).

[3] Proctitis is inflammation of the mucous membrane of the rectum.  *Stedman's Medical Dictionary* 1432 (26th ed. 1995).

[4] Guiac is a regent for testing occult blood.  *Stedman's Medical Dictionary* 750 (26th ed. 1995).

[5] Prothrombin time indicates the severity of hepatocellular disease.  *The Merck Manual* 346 (17th ed. 1999).

level of 7.7.  Dr. Lundy noted he admitted Flores for "gastrointestinal bleeding, cirrhosis, alcohol abuse and probably early alcohol withdrawal."  *Id.*

Dr. Lundy prescribed Librium to treat the symptoms of withdrawal.  Dr. Lundy also prescribed vitamins.  Dr. Lundy monitored Flores' anemia in order to determine whether Flores would require a blood transfusion.  Flores' hematocrit was 27 and his hemoglobin was 9.  The normal values for a male are: hematocrit 41-50% and hemoglobin 13.8-17.2 g/dL.  *The Merck Manual* 2531(17th ed. 1999).  Dr. Lundy decided to treat Flores with iron.  Dr. Lundy advised Flores that he seriously needed to discontinue alcohol otherwise he would die within a couple of years.  Dr. Lundy directed Flores to return for a follow-up at Dr. Lundy's office on March 24, 1999.  At that time, Flores was taking Aldactone (diuretic and antihypertensive) 25 mg three times a day, Zantac 150 mg twice a day, Librium 50 mg three times a day, Dilantin 300 mg at bedtime (used in the treatment of seizures), prenatal vitamins with iron and folic acid.  Dr. Lundy discharged Flores on March 22, 2004.

On March 24, 1999, Dr. Lundy saw Flores for his follow-up after being hospitalized for alcohol abuse, cirrhosis of the liver, and a gastrointestinal bleed.  Tr. 318.  Dr. Lundy performed a blood test that indicated Flores had a hemoglobin of 8 and a hematocrit of 25.  Dr. Lundy advised Flores he would need a blood transfusion.  Dr. Lundy directed Flores to report to the hospital on March 26, 1999 for admission for blood transfusion and evaluation of ammonia level.

On March 29, 1999, Dr. Lundy evaluated Flores.  Tr. 317.  Flores complained of feeling "worse in his stomach."  *Id.*  Dr. Lundy noted Flores' weight was up to 226 pounds from 205 pounds the previous week.  Flores had been hospitalized for a blood transfusion a few days before to treat his anemia.  Dr. Lundy reported an increased abdominal girth of 117 cm, increased

ascites, and edematous extremities.  Dr. Lundy opined Flores was in very poor condition.  Flores

had stopped taking the Aldactone and Dilantin.  Flores was only taking his Librium.  Dr. Lundy

directed Flores to resume his Aldactone and opined Flores had "learned his lesson now with

alcohol and will not drink any more alcohol."  *Id.*

On March 31, 1999, Flores went to Dr. Lundy for a check-up.  Tr. 312.  Flores

complained that his stomach was hurting.  Dr. Lundy noted Flores was in for a follow-up of his

cirrhosis of the liver.  Because Flores lacked the money to pay for laboratory work, Dr. Lundy

advised him to save whatever money he had and use it for medication.

On April 14, 1999, Flores returned for a follow-up with Dr. Lundy.  Tr. 312.  Flores

reported having cramps in his body and experiencing panic attacks.  Flores also complained that

his balance was not good.  Dr. Lundy noted Flores' weight was up to 214 ½ pounds and

prescribed Lasix 40 mg (antidiuretic), twice a day for the water retention.  Dr. Lundy directed

Flores to continue taking his Aldactone but increase it to four times a day.

On April 20, 1999, Flores returned for his follow-up.  Flores complained of dizziness,

shortness of breath, and fatigue.  Tr. 312.  He reported his family and friends were telling him his

eyes were getting "more yellow."  *Id.*  Dr. Lundy opined the sclera was not as yellow as when he

first started treating him when the sclera was green.  Dr. Lundy noted Flores was improving in

that he had lost some weight, down to 208 pounds and his blood pressure was 106/60.  Dr.

Lundy noted Flores' extremities had very little edema and his abdomen was much softer, but he

still had quite a bit of ascites.

On April 26, 1999, Dr. Lundy Admitted Flores to Mimbres Memorial Hospital.  Tr. 305-

306.  Dr. Lundy noted he was admitting Flores because he was "coughing up blood and spitting

13

up blood."  Tr. 305.  Dr. Lundy also noted Flores was weaker and not doing as well as he had

been the previous week.  Dr. Lundy reported Flores came to his office on April 26, 1999 and was

definitely weaker and his eyes were almost green.  Dr. Lundy noted he had to hospitalize Flores

for "treatment of hypo-bulimia as a result of epigastric intestinal bleeding, secondary to cirrhosis

of the liver."  *Id.*.

Under "Past Medical History,"  Dr. Lundy noted Flores had ceased drinking on March 19,

when he was hospitalized for the first time for cirrhosis of the liver.  The physical examination

noted green sclera, severe gingivitis, muscle weakening in the neck and shoulders, rales in bottom

bases of the lungs, tachycardia, distended abdomen as a result of the ascites, liver and spleen was

not palpable due to "the large quantity of ascites," bruises on abdomen, chest and extremities,

pitting edema of the legs, hematocrit of 26 (low), hemoglobin of 9.43 (low), and platelet count of

49,700 (low).

Dr. Lundy ordered two units of packed red blood cells.  Post-transfusion, Flores'

hematocrit and hemoglobin were 32.8 and 11.4, respectively.  Dr. Lund noted:

> The patient post transfusion, has a hemoglobin of 11.4, hematocrit of of 32.8 and his
> platelets were raised up to 54,900.  I also obtained a pro Prothrombin time; it was
> extremely elevated, it was around 26 with an INR of 5.  I gave the patient 10 mg of
> vitamin K intramuscularly and repeated the PT and it was still elevated so the patient
> received two units of fresh frozen plasma.  During the hospitalization he showed no signs
> of further bleeding.  On 4/28/99 his hemoglobin was 11.9, hematocrit wa 29.1, platelets of
> 182,000.  At this time, I elected to let the patient go home.  I told him to come by my office
> to pick up samples of Prilosec and [have] given him samples to take 20 mg twice a day.
> He will continue taking Aldactone but up to 4 times a day now and I gave him a
> prescription for Pen VK 500 mg to take one 4 time a day to try and prevent  any
> respiratory infection since he is complaining of a little sore throat and is still having a dry
> cough, but I think the cough is mainly due to some fluid within the lungs as a result of his
> hypoproteinemia.  The patient will also continue on Librium, but we are going to reduce
> the dosage now down to 25 mg twice a day.

Tr. 306.  On May 3, 1999, Flores returned for a check-up with Dr. Lundy.  Tr. 303.  Flores

reported feeling better.  His weight was down to 193 pounds and his abdominal girth was down

to 110 cm.  Dr. Lundy noted Flores was able to "ambulate much faster" and had better balance.

*Id.*  Flores reported his stools had not been black (evidence of internal bleeding) and his gums

were no longer bleeding.

On May 10, 1999, Dr. Lundy evaluated Flores for weakness, dizziness, and fatigue.  Tr.

301.  Flores' weight was down to 183 pounds and his abdominal girth was down to 106 cm.  Dr.

Lundy noted Flores' ascites had "subsided greatly," but he still had some visceromegaly.[6]  *Id.*

Dr. Lundy found no evidence of any encephalopathy as a result of the liver disease.  Flores

reported he was not bleeding as much as he had been bleeding several weeks before.

On May 17, 1999, Flores returned for a follow-up visit with Dr. Lundy.  Tr. 309.  At that

time, Dr. Lundy noted Flores' weight as 181 pounds and his abdominal girth as 98 cm.  Flores

reported he felt better but was depressed because his family left to Oklahoma after visiting him for

two weeks.  Dr. Lundy opined Flores was stable and recommended he return on a weekly basis.

Dr. Lundy noted Flores problem was cirrhosis of the liver.

On May 24, 1999, Flores returned for his  follow-up visit with Dr. Lundy.  Tr. 299.

Flores reported feeling very nervous.  Dr. Lundy directed Flores to resume his Librium 10 mg

daily.  Dr. Lundy also increased Aldactone to twice a day instead of once a day.  Flores' weight

had gone up since his last visit.  Flores reported he was breathing and walking better.  Dr. Lundy

---

[6] Visceromegaly is an abnormal enlargement of the viscera.  *Stedman's Medical Dictionary* 1948 (26th ed. 1995).  Viscera is an organ of the digestive, respiratory, urogenital, and endocrine systems as well as the spleen, the heart, and great vessels.  *Id.* at 1949.  In this case, Dr. Lundy was referring to Flores' enlarged liver.

15

noted, "I think the patient is stable enough to go out and look for work.  He is to start doing manual labor."  *Id.*  Dr. Lundy diagnosed Flores as "cirrhosis of the liver which is currently stabilized."  *Id.*

On August 17, 1999, Flores returned to see Dr. Lundy with complaints of extreme anxiety, swollen legs, and dizziness.  Tr. 295.  Flores had been in Oklahoma and had tried to get a job "but he couldn't hold a job because of the swelling on his feet."  *Id.*  Flores was also unable to continue with his medication while he was out in Oklahoma.  Flores also reported more bruising.  Dr. Lundy performed an examination and noted increased bruising over Flores' chest, spider angiomas of the chest, and the presence of ascites.  Dr. Lundy opined Flores was anemic from gastrointestinal bleeding but Flores could not afford the blood tests at that time.  Dr. Lundy advised Flores to start his medications and  take vitamins and iron.  Dr. Lundy noted Flores would need to be hospitalized for a possible blood transfusion if his condition did not improve.    On August 24, 1999, Dr. Lundy evaluated Flores.  Tr. 298.  Flores' weight was 184 pounds.  Flores complained of nausea and vomiting for two days.  Flores reported his "nerves were still shot."  *Id.*  Dr. Lundy increased Flores' Librium to three times a day to control his anxiety.  Dr. Lundy noted, "I explained to him that cirrhosis is something that cannot be cured.  You only try to manage the condition and the nausea and his weakness, as the result of the cirrhosis."  *Id.*  Dr. Lundy told Flores "to be patient and go look for work, work for a couple of hours a day if possible and then rest."  *Id.*

On September 8, 1999, Flores returned for a follow-up visit with Dr. Lundy.  Tr. 296.  Flores' weight was now up to 192 pounds.  Flores was doing better but complained of a decreased sexual drive as a result of cirrhosis of the liver.

16

On September 13, 1999, Dr. Lundy submitted a letter of disability to the SSI, Disability

Unit.  Tr. 297.  Dr. Lundy noted in his letter that he had been involved in Flores' care since March

of 1999.  In his letter, Dr. Lundy opined as follows:

> Mr. Flores has cirrhosis of the liver and as a result of this condition, he is susceptible to
> gastrointestinal bleeding.  On two occasions he has been hospitalized for a blood
> transfusion in order to correct an anemia associated with the gastrointestinal bleeding.  His
> condition is incurable, however, with proper diet and medication, we can certainly slow
> down the progression of this disease.
>
> Mr. Flores is on medication that he needs to take on a daily basis.  At times it presents a
> financial hardship for him to pay for this medication.  He has tried to do odd jobs such as
> yard work, however, he becomes fatigued very easily.  So, he can only work for about an
> hour and a half to two hours before he becomes fatigues and cannot continue with his
> work.  Therefore, it is my opinion, that this patient will not be able to hold a full time job.
> I am asking that you seriously consider Mr. Flores for Medicaid, if at all possible, so at
> least he can obtain his medications that will help prevent the progression of his disease.

Tr. 297.

On September 28, 1999, Flores returned to see Dr. Lundy with complaints of nausea and

dizziness.  Flores also complained of diarrhea and blood in his stools.  Flores reported being very

depressed.  Flores' weight was up to 202 ½ pounds.  Dr. Lundy noted the importance of keeping

Flores' ascites free and increased the Aldactone 25 mg to three times a day.  Dr. Lundy also

directed Flores to take the Librium at least one twice a day to prevent episodes of stress.  Dr.

Lundy prescribed Zantac 75 mg twice a day for the epigastric pain.  Dr. Lundy explained to Flores

that the blood in his stools was most likely digested blood which was coming from his esophageal

varices (a dilated vein) as a result of cirrhosis of the liver.  Dr. Lundy noted bruises on Flores'

abdomen as well as over his shoulders, also a result of the cirrhosis of the liver.

On October 19, 1999, Flores returned for his follow-up with Dr. Lundy.  Tr. 294.  Dr.

Lundy noted Flores' weight was up to 199 ½ pounds.  Flores complained that his legs were

swelling, he was having nose bleeds, he was fatigued, he was unable to sleep, he felt faint, he had epigastric pain, and he had blood in his stools.  Dr. Lundy noted Flores' eyes were not a yellow as in the past, there was less ascites, less evidence of bruising, and there was less gingivitis.  Overall, Dr. Lundy felt Flores' cirrhosis of the liver was stabilized.

On November 1, 1999, Flores returned to see Dr. Lundy.  Tr. 293.  Flores complained of fatigue, nausea, swollen feet, and nervousness.  Dr. Lundy noted Flores weighed 212 pounds.  Dr. Lundy instructed Flores to take his Aldactone 25 mg three times a day to help treat his edema associated with his cirrhosis of the liver.

On November 4, 1999, Dr. Lundy admitted Flores to Mimbres Memorial Hospital "for symptoms and signs suggesting a respiratory infection associated with cirrhosis of the liver and thrombocytopenia."  Tr. 292.  Dr. Lundy's November 6, 1999 Discharge Summary noted Flores had ascites and pitting edema, a white cell count of 2,600, hemoglobin of 9.6, hematocrit of 27.1, platelets of 26,900, and bilirubin of 9.2.  Dr. Lundy also noted Flores had received a 6 pack of platelets.  Dr. Lundy prescribed Penicillin 500 mg for the respiratory infection and told Flores to pick up samples at his office.  Flores had no insurance and no means of buying  his medication. Therefore, Dr. Lundy supplied Flores with samples.  Dr. Lundy diagnosed Flores with lower respiratory infection, cirrhosis of the liver and thrombocytopenia.

On November 8, 1999, Dr. Lundy noted Flores had come to the office for some medication (samples) for the treatment of influenza.  Dr. Lundy noted Flores recently had been hospitalized for influenza and had received platelets and diuresis.

On December 30, 1999, Flores presented with a swollen face, leg cramps, and reported he felt faint.  Tr. 290.  Dr. Lundy noted Flores was beginning to retain fluid again and prescribed Spironolactone (diuretic).

On January 4, 2000, Flores returned to see Dr. Lundy.  Tr. 290.  Flores reported feeling better.  Flores' weight was 210 pounds, but he had less edema.  Dr. Lundy noted that he called social services to inquire about Flores' Medicaid card.  The social worker advised Dr. Lundy that Flores would be receiving the Medicaid card soon.

On January 13, 2000, Flores returned for a follow-up visit with Dr. Lundy.  Tr. 292.  Dr. Lundy noted Flores now had a Medicaid card.  Flores complained of increased swelling of his feet and requested an evaluation by a dentist.  Flores reported his gums were bleeding more than usual.  Dr. Lundy referred Flores to a dental clinic and prescribed Penicillin VK.  Dr. Lundy instructed Flores to take the penicillin prior to visiting the dentist because he had a systolic heart murmur.  Dr. Lundy noted edema of both feet and increased the Aldactone to four times a day.

In his decision, the ALJ noted both the agency non-examining consultants' opinions that Flores retained the capacity for work activities and Dr. Lundy's opinion that Flores was unable to work.  However, the ALJ resolved this conflict "based upon the claimant's admission at the hearing indicating an ability for sedentary work."  Tr. 18.  This was error.

The Tenth Circuit has made clear that "[u]nder the regulations, the agency rulings, and our case law, an ALJ must give good reasons . . . for the weight assigned to a treating physician's opinion," that are "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinions and the reason for that weight." *Watkins v. Barnhart*, 350 F.3d 1297, 1300 (10th Cir. 2003).  In this case, the ALJ failed to

articulate the weight, if any, that he gave Dr. Lundy's opinion.  Instead, even though Dr. Lundy's

opinion of disability is <u>well supported</u> by the medical record and not inconsistent with other

substantial evidence, the ALJ rejected Dr. Lundy's medical opinion of disability and based his

RFC determination and finding of "no disability" on Flores' testimony at the hearing.

 In his decision, the ALJ found Flores had testified that "he performs yard work; he is able

to drive with no restrictions on his license; he visits friends and relatives; he reads; watches TV;

hunts and fishes; he does housework; and, he is able to shop.  He is able to see to his grooming

needs; he helps his children get ready for school; he plays basketball; and, testifies that he can sit

for ½ hour, stand for up to 1 hour, walk a quarter of a mile, and lift up to 35 to 40 pounds."  Tr.

19.  Based on these findings, the ALJ found Flores had the ability for sedentary work.

 Although statements regarding daily activities are evidence properly considered under the

Commissioner's regulations, s*ee* 20 C.F.R. § 416.929(a), the Court finds that the evidence the

ALJ cited in his decision does not constitute substantial evidence in support of the ALJ's

determination that Flores retained the RFC to perform sedentary work.  *See, Miller v. Chater,* 99

F.3d 972, 977, 978 (10th Cir.1996)(stating that evidence of claimant's driving and employment

can provide no more than a "scintilla" of support for the [Commissioner's] determination that

claimant retained sufficient RFC to perform other forms of work); *see also Markharm v.*

*Califano*, 601 F.2d 533, 534 (10th Cir. 1979) ("Ability to drive an automobile, participate in

some community affairs, attend school, or to do some work on an intermittent basis does not

necessarily establish that a person is able to engage in a 'substantial gainful activity,' but such

activities may be considered by the [Commissioner], along with medical testimony, in determining

the right of a claimant to disability payments under the Act.")  The ALJ should have given Dr. Lundy's opinion that Flores was disabled the proper weight.

Additionally, the Court has reviewed Flores' testimony and finds the ALJ misconstrued it. Flores testified he went fishing "sometimes" and mentioned he went hunting but did not state how often or how long it had been since he had done either activity.  Tr. 46-47.  Flores also testified he helped his wife with the housework but did not go into detail as to what that entailed except to mention that he picked up after the children.  Tr. 48.  Flores also testified he played basketball with his kids but "tired real easy and they beat him."  Tr. 50.  As to visiting friends and relatives, Flores testified he did not visit people because he "really [did not] like to be around a lot of people because [he] got real nervous.  Tr. 46.  Flores testified he visited his mother twice a month but his wife went with him.  Tr. 50.  These activities do not support a finding that Flores could perform sedentary work.  Accordingly, the Court finds that the ALJ's RFC determination and finding of nondisability are not supported by substantial evidence.  Because "[f]urther administrative proceedings would only further delay the appropriate determination and award of benefits," *Dixon v. Heckler*, 811 F.2d 506, 511 (10th Cir. 1987), the case is remanded for the immediate calculation and award of benefits.

**C.  Conclusion**

The Court's review of the ALJ's decision, the record, and the applicable law indicates the ALJ's decision does not adhere to applicable legal standards and is not supported by substantial evidence.  The ALJ's finding that Flores was not disabled is not supported by substantial evidence.  Accordingly, the decision of the ALJ is reversed and remanded to the Commissioner for an immediate award of benefits.

A judgment in accordance with this Memorandum Opinion will be entered.

_____
**DON J. SVET**
**UNITED STATES MAGISTRATE JUDGE**

22